[Cite as *Miller v. Ohio Dept. of Health, Vital Statistics*, 2021-Ohio-996.]

| | |
|---|---|
| ROSANNA L. MILLER | Case No. 2020-00618PQ |
| Requester | Special Master Jeff Clark |
| v. | <u>REPORT AND RECOMMENDATION</u> |
| OHIO DEPARTMENT OF HEALTH, VITAL STATISTICS | |
| Respondent | |

{¶1} The Ohio Public Records Act (PRA) requires copies of public records to be made available to any person upon request. The state policy underlying the PRA is that open government serves the public interest and our democratic system. To that end, the public records statute must be construed liberally in favor of broad access, with any doubt resolved in favor of disclosure of public records. *State ex rel. Rogers v. Dept. of Rehab. & Corr.*, 155 Ohio St.3d 545, 2018-Ohio-5111, 122 N.E.3d 1208, ¶ 6.

{¶2} This action is filed under R.C. 2743.75, which provides an expeditious and economical procedure to enforce the PRA in the Court of Claims. Requester Rosanna Miller alleges that respondent Ohio Department of Health, Vital Statistics, violated the PRA by failing to provide her with access to public data from Ohio death certificates concerning Covid-19 deaths.

**Request for Ohio Death Data Records**

{¶3} On April 20, 2020, Rosanna Miller made a public records request to Karen Sorrell, Chief of the Ohio Department of Health, Office of Vital Statistics (ODH/VS), for the following:

> Would you please run a report for all Cause of Deaths in Ohio coded as Covid-19 (U07.1)
>
> With the following search criteria <u>per column</u>:
>
> 1. First Name of deceased
> 2. Last Name of deceased

3. Age

3. Date of Death (YEARMODAY format)

4. County of Death

5. Autopsy (Y or N)

6. Place of Death (hospital, residence, etc)

7. Death Code U07.1 Covid-19

(Complaint, Exh. A.) On April 23, 2020, Sorrell responded:

> I will save your request and will contact you when we return to normal operations and start doing special data requests. I can't promise how soon that will be but based on the latest information regarding this pandemic I'm guessing it may not be until the beginning of June.

(*Id.*) Miller sent a follow-up inquiry on September 25, 2020 (*Id.*, Exh. C), to which Sorrell responded:

> I'm sorry but I am not going to be able to provide you the data that you are requesting. My bureau is no longer doing customized requests for data and what you are requesting is a customized dataset as we do not have one that contains the variables you are requesting. Ohio Revised Code section 149.43(A) states that a public record is a record kept by the agency. The document that you are requesting is not kept by the Bureau of Vital Statistics and the Ohio Supreme Court has ruled that an agency is not required to create a record that it does not possess.

(*Id.*, Exh. D.)

{¶4} On October 23, 2020, Miller filed a complaint pursuant to R.C. 2743.75 alleging denial of access to public records in violation of R.C. 149.43(B). On October 30, 2020, the special master determined that the case should not be referred to mediation and ordered ODH/VS to file its response. On November 20, 2020, with leave of court, ODH/VS filed a response to requester's complaint and motion to dismiss (Response). On December 10, 2020, Miller filed a reply. On February 16, 2021, ODH/VS filed a sur-reply. On March 15, 2021, Miller filed a response to the sur-reply.

**Motion to Dismiss**

{¶5} To dismiss a complaint for failure to state a claim upon which relief can be granted, it must appear beyond doubt that the claimant can prove no set of facts warranting relief after all factual allegations of the complaint are presumed true and all reasonable inferences are made in claimant's favor. *State ex rel. Findlay Publishing Co. v. Schroeder*, 76 Ohio St.3d 580, 581, 669 N.E.2d 835 (1996). As long as there is a set of facts consistent with the complaint that would allow the claimant to recover, dismissal for failure to state a claim is not proper. *State ex rel. V.K.B. v. Smith*, 138 Ohio St.3d 84, 2013-Ohio-5477, 3 N.E.3d 1184, ¶ 10.

{¶6} ODH/VS argues the complaint fails to state a claim because the requested records do not exist. On review, non-existence of the requested data output is not conclusively shown on the face of the complaint and attachments. Moreover, as the matter is now fully briefed this argument is subsumed in ODH/VS' defense on the merits. It is therefore recommended that that the motion to dismiss be denied.

**Burden of Proof**

{¶7} A requester must establish a public records violation by clear and convincing evidence. *Hurt v. Liberty Twp.*, 2017-Ohio-7820, 97 N.E.3d 1153, ¶ 27-30 (5th Dist.). At the outset, the requester bears the burden of production to plead and prove facts showing she sought identifiable public records pursuant to R.C. 149.43(B)(1). *Welsh-Huggins v. Jefferson Cty. Prosecutor's Office*, Slip Opinion No. 2020-Ohio-5371, ¶ 33. Miller must show that the items sought meet the statutory definition of "records," and that the records were kept by ODH/VS. ODH/VS does not dispute that death certificates and their contents are records of ODH/VS, but asserts that, 1) data from the death certificates does not exist in the format requested by Miller, and 2) the requested dataset is exempt from disclosure as "protected health information" under R.C. 3701.17.

**The Request Sought ODH/VS "Records"**

{¶8} "Records" are defined in R.C. 149.011(G) as

any document, device, or item, regardless of physical form or characteristic, including an electronic record as defined in section

1306.01 of the Revised Code, created or received by or coming under the jurisdiction of any public office of the state or its political subdivisions, which serves to document the organization, functions, policies, decisions, procedures, operations, or other activities of the office.

"Records" includes documents, items within them, and reports or files aggregated from separate records. *Kish v. Akron,* 109 Ohio St.3d 162, 2006-Ohio-1244, 846 N.E.2d 811, ¶ 20-24; *State ex rel. Data Trace Info. Servs., L.L.C. v. Cuyahoga Cty. Fiscal Officer*, 131 Ohio St.3d 255, 2012-Ohio-753, 963 N.E.2d 1288, ¶ 28-38*.*

{¶9} Miller seeks electronic records received or created by ODH/VS that serve to document its operations as the statewide repository and provider of vital statistics. Each death in Ohio is documented with a local registrar of vital statistics. R.C. 3705.16. The local registrar and others transmit death certificate data to ODH/VS on electronic or paper forms. R.C. 3705.08(A) and (D); OAC 3701-5-02. ODH/VS verifies each form, secures additional information as necessary, and maintains all death certificate record content in its records management systems. R.C. 3705.02, 3705.07(A), (Response, Sorrell Aff. I at ¶ 2, Sur-reply, Sorrell Aff. II, Exh. A at ¶ 7.) The ODH Certificate of Death form is prescribed by rule. OAC 3701-5-02(A)(2) Certificate of Death (Appendix B, dated 6/23/2016). The death certificate form requires entry of the following numbered data fields corresponding to Miller's request:

1. Decedent's Legal Name (First, Middle, Last, Suffix)

5a. Age (Years)

3. Date of Death (Mo/Day/Year)

18d. County of Death

29a. Was An Autopsy Performed?

18a. Place of Death

18b. Facility Name (If not Institution, give street & number)

28. Part I. Enter the disease, injuries, or complications that caused the death.

{¶10} "Public records" means records *kept by* a public office. R.C. 149.43(A)(1). ODH/VS does not dispute that it keeps all death certificate data. ODH/VS argues only that the requested data report "does not exist" because ODH/VS does not routinely print out the specific "grouping" of death data requested by Miller. (Response at 3.)

**Electronic Death Registration System (EDRS)**

{¶11} ODH/VS keeps death certificate data in at least two databases. The first is the Electronic Death Registration System (EDRS) used by ODH/VS "to file and maintain death records in Ohio." (Sorrell Aff. I at ¶ 2.) *See* R.C. 3705.07(A). EDRS is used to print and certify death certificates when requested pursuant to R.C. 3705.23(A). (Sorrell Aff. II, Exh. A at ¶ 7.) EDRS is programmed with a Reports function, supported by a Reports Wizard. (Sorrell Aff. II, Exh. A at ¶ 6, Exh. G – EDRS Menu Screen Shots.) ODH/VS uses EDRS data to produce recurring reports, including a Deceased Ohioans Report composed of the dataset "name, address, sex, last four digits of the SSN, birth state, date of birth and date of death." (Sorrell Aff. I at ¶ 5.) EDRS offers a separate option to create Ad Hoc Reports. (Sorrell Aff. II, Exh. A at ¶ 6, Exh. G – EDRS Menu Screen Shots.) The reporting functions in the EDRS menu appear to be programmed features of office software, the use of which would not involve writing a new computer program or reprogramming the computer system. *See State ex rel. Kerner v. State Teachers Retirement Bd.*, 82 Ohio St.3d 273, 274-275, 695 N.E.2d 256 (1998).

**EnterpriseDatawarehouseSecure**

{¶12} The requested data is also accessible in the EnterpriseDatawarehouseSecure database. (Sorrell Aff. II, Exh. A at ¶ 2.) The EnterpriseDatawarehouseSecure database has a Secure Portal, through which ODH/VS and other authorized users may access the Secure Mortality Module. (*Id.*) From there, users can process, inter alia, the variables listed in the Death Data File, and produce downloadable files. (*Id.* at ¶ 4, Exh. B – Death Data File Layout.) The Death Data File Layout (self-titled the "Monthly statistical mortality file description") includes all

data categories sought in Miller's request, which are available as the following ".csv Column[s]":[1]

| F. | Decedent's Legal Name—Given |
| H. | Decedent's Legal Name—Last |
| N. | Decedent's Age—Units 001-135 |
| B. | Date of Death—Year |
| AC. | Date of Death—Month |
| AD. | Date of Death—Day |
| AA. | County where death occurred |
| CP. | Was an Autopsy Performed? (Code: Y, N) |
| Z. | Place of Death (Code: 1 Inpatient 2 Emergency Room/Outpatient 3 Dead on Arrival 4 Decedent's Home 5 Hospice Facility 6 Nursing Home/Long Term Care Facility) |
| CO. | Record Axis Codes (Code: All the ICD-10 codes assigned to the causes of death in the death certificate) |

(*Id.*) Users of the Secure Portal can download EnterpriseDatawarehouseSecure output in Excel, PDF, Word, CSV file, and Print. (*Id.*, Exh. A at ¶ 2.)

**Special Master's Request for Database Information and Documents**

{¶13} To assist the court's determination of whether the requested records can be produced by ODH/VS database software, the special master requested additional information and documents regarding database content, capability, and management. (January 22, 2021 Order.) The resulting narrative responses and documents inform the descriptions of the EDRS and EnterpriseDatawarehouseSecure databases above, and

---

[1] A Comma Separated Values (CSV) file uses a comma to separate text and numerical data fields. CSV files are often used for exchanging data between different applications and formats, such as database and spreadsheet programs. https://en.wikipedia.org/wiki/Comma-separated_values (Accessed March 20, 2021.)

evidence robust information management capabilities typical of database software. With regard to customizable output, ODH/VS was asked the following question:

> Identify the content of the ODH report described as a 'Death Data File.' *State whether the ODH data management program used to produce this report in the past remained capable on April 20, 2020 of producing the report.*

(Emphasis added.) (*Id.*) ODH/VS answered:

> The Death Data file contains the variables in the attachment named Death Data File Layout. Although, *the Bureau of Vital Statistics could produce this report on April 20, 2020 using 3rd party software*, it is not created in the normal course of business and serves no operational function.

(Emphasis added.) (Sorrell Aff. II, Exh. A at ¶ 4.) The overall import of the sur-reply is that ODH/VS used an ODH/VS data management program to produce reports from the Death Data File in the past and could still produce those reports on April 20, 2020.

**Respondent's Denial That Requested Records Exist**

{¶14} ODH/VS has asserted, improbably during a COVID-19 pandemic, that the EDRS is "not programmed to produce" a report of deaths caused by COVID-19 with identifying data for the decedents, such as Miller requested. (Response at 3, Sorrell Aff. I at ¶ 4.) However, Chief Sorrell explained what she meant by this assertion:

> Rosanna Miller is requesting specific information grouped together in a specific manner. Ms. Miller is asking for a unique report. In the ordinary course of ODH/VS's business, ODH/VS has no need for this information grouped in this manner. ODH/VS does not have the unique report that Ms. Miller is requesting.

(*Id.*) Given the robust reporting capabilities of ODH/VS databases, Sorrell clearly uses "*not programmed*" in the colloquial sense of "not previously produced using existing software options" rather than the technical meaning: "cannot be produced without reprogramming the database software." Likewise, Sorrell refers in her denial to Miller's "customized request for data," i.e., a selection from available data. (Complaint, Exh. D.) Notably, ODH/VS does not support any suggestion that ODH/VS software lacks the

capability to produce Miller's dataset with affidavits of "ODH Information Technology personnel," as invited by the special master. (January 22, 2021 Order at ¶ 9.)

{¶15} Sorrell admits that other reports have been created with ODH/VS software, just not one containing the precise content and grouping of Miller's request. Sorrell attests that a monthly customized dataset is produced from EDRS data titled the Deceased Ohioans Report which contains the name, address, sex, last four digits of the SSN, birth state, date of birth, and date of death (Sorrell Aff. I at ¶ 6). Sorrell explains that "to provide the report requested by Ms. Miller, ODH/VS would be required to use additional licensed[2] software to extract and organize this information from EDRS." (*Id.*) Rather than a denial, this statement shows that the functions of available software, presumably the same software used to "customize" data for the Deceased Ohioans Report, can be used to produce Miller's dataset. ODH/VS elsewhere concedes that the requested dataset is available utilizing an "analytical software program, external to EDRS, to extract and organize the information." (Response at 3.) ODH/VS does not deny that it maintains and uses the curiously unnamed external licensed software.[3] However, the name of the software and the software's origin as in-house vs. 3rd party are immaterial. Nor does it matter that ODH/VS does not create the requested report for what it considers "normal" agency purposes. Responding to public records requests is a mandated "normal" function of every public office. R.C. 149.43(B)(1).

**Requester's Evidence**

{¶16} Miller attests that she has received similar records from ODH/VS in the past. (Complaint at 2, Miller Aff. at ¶ 3.) As demonstrative evidence, Miller submits two past ODH/VS death database reports using Death Data File categories for the data

---

[2] Most commercial software used to produce copies of electronic records, e.g., Microsoft Word and Adobe Acrobat, is licensed to users rather than owned. However, the only material issue is whether the software is available within the office to produce the requested output.

[3] The special master assumes that "3rd party software" and "analytical software program" are references to the EnterpriseDatawarehouseSecure database software, but if not, the term necessarily refers to yet a third available software program capable of producing the requested records.

columns and IC-10 codes for cause of death. The reports are for specified causes of death in a three-year period, matched with decedent's names and customized information. (Reply at 2-3, Exh. F, H.) ODH/VS acknowledges that "[w]e used to provide customized datasets" (Complaint, Exh. D) and does not deny that it provided Miller with the subsets of EDRS death certificate data in Exhibits F and H. (Sorrell Aff. II, Exh. A at ¶ 4, 6.)

{¶17} Together, the evidence of EDRS menu options, ODH/VS descriptions of EDRS and EnterpriseDatawarehouseSecure output functions, the Death Data File Layout, multiple databases accessing the EDRS data, export capability, and examples of previous customized death data output, are clear and convincing evidence that ODH/VS database systems have produced such output for requesters in the past and remained capable of producing Miller's requested output on April 20, 2020.

**The Database Rule**

{¶18} To facilitate access, "a public office or the person responsible for public records shall organize and maintain public records in a manner that they can be made available for inspection or copying in accordance with division (B) of this section." R.C. 149.43(B)(2). ODH/VS must comply with this duty by using its software, knowledge, and experience to produce "customized datasets" of death certificate data already compiled in one database. *Compare Speros v. Secty. of State*, Ct. of Cl. No. 2017-00389PQ, 2017-Ohio-8453, ¶ 12-19 (requested dataset divided among multiple databases.)

{¶19} If a computer as programmed can produce requested output, the output is deemed to already exist for the purposes of a public records request. *State ex rel. Scanlon v. Deters*, 45 Ohio St.3d 376, 379, 544 N.E.2d 680 (1989). *See Welsh-Huggins v. Jefferson Cty. Prosecutor's Office*, Slip Opinion No. 2020-Ohio-5371, ¶ 74 ("If a record containing exempt and nonexempt information can, through reasonable computer programming, produce the requested output, the record is deemed to already exist," citing *Scanlon*); *State ex rel. Gambill v. Opperman*, 135 Ohio

St.3d 298, 2013-Ohio-761, 986 N.E.2d 931, ¶ 4, 12, 16, 32-35 (electronic database was capable of compiling deeds, photographs, and other data into specific tax maps based on the operator's search criteria); *Eye on Ohio v. Ohio Dept. of Health*, Ct. of Cl. No. 2020-00279PQ, 2020-Ohio-5278, ¶ 4, fin. 2 (Covid-19 data requested from ODH Surgenet system).

{¶20} Miller could obtain paper death certificates within her date range by paying $12 each.[4] She could identify those containing COVID-19 as cause of death and type each decedent's information into a spreadsheet. If ODH/VS redacted any data, she could visit local registrars and copy the missing information. R.C. 3705.231. This process would entail great expense and effort, just to duplicate what ODH/VS easily provides from a database. Fortunately, Miller is not required to forfeit the value that has been added to death certificate records by ODH/VS' manner of storage and organization. *State ex rel. Margolius v. Cleveland*, 62 Ohio St.3d 456, 559-460, N.E.2d 665 (1992). As the Fourth District Court of Appeals summarized:

> The basic tenet of *Margolius* is that a person does not come - like a serf - hat in hand, seeking permission of the lord to have access to public records. Access to public records is a matter of right. The question in this case is not so much whether the medium should be hard copy of [sic] diskette. Rather, the question is: Can a government agency, which is obligated by law to supply public records, impede those who oppose its policies by denying the value-added benefit of computerization?

> The Ohio Supreme Court answered this question first in *State ex rel. Cincinnati Post v. Schweikert* (1988), 38 Ohio St.3d 170, 173-174, 527 N.E.2d 1230, 1233, when it held:

---

[4] *See* O.A.C. 3701-5-03. The fee is only for *certified* copies. *See State ex rel. Data Trace Info. Servs., L.L.C. v. Cuyahoga Cty. Fiscal Officer*, 131 Ohio St.3d 255, 2012-Ohio-753, 963 N.E.2d 1288, ¶ 42-64 (statutory fee to "photocopy" records did not apply to *electronic* copy of database).

Miller has recently made a similar request. (Requester's March 15, 2021 pleading at p. 6-8.)

> "The law does not require members of the public to exhaust their energy and ingenuity to gather information which is already compiled and organized in a document created by public officials at public expense."

> The *Margolius* court further stated, in following its holding in *Cincinnati Post*:

> "Similarly, a public agency should not be permitted to require the public to exhaust massive amounts of time and resources in order to replicate the value added to the public records through the creation and storage on tape of a data base containing such records." *Margolius, supra*, 62 Ohio St.3d at 460, 584 N.E.2d at 669.

*State ex rel. Athens Cty. Property Owners Assn. v. Athens*, 85 Ohio App.3d 129, 131, 619 N.E.2d 437 (4th Dist.1992). *See also Parks v. Webb*, Ct. of Cl. 2017-00995PQ, 2018-Ohio-1578, ¶ 10-17.

{¶21} Ohio death certificates stored in ODH/VS databases are compiled using taxpayer dollars, on equipment purchased with taxpayer dollars, by personnel paid with taxpayer dollars. The record provides clear and convincing evidence that ODH/VS keeps the requested data in these databases, has produced "customized datasets" of this data in the past, and remains capable of producing the requested output. The special master finds that Miller has met her burden to show that she has made a proper request for existing ODH/VS records.

### Initial Basis for Denying Request

{¶22} Miller complains that Chief Sorrell first advised only of a delay in getting her dataset, but then decided to deny the request, "based on the influx of requests for customized datasets and the limited resources I have." (*Id.*, Exh. D.) Miller is correct that this is not a permissible basis for denying a public records request. ODH/VS may not avoid its obligations under the Public Records Act merely because it finds them inconvenient. "No pleading of too much expense, or too much time involved, or too much interference with normal duties, can be used by the respondent to evade the public's right to inspect and obtain a copy of public records within a reasonable time."

*State ex rel. Beacon Journal Publishing Co. v. Andrews* 48 Ohio St.2d 283, 289, 2 O.O.3d 434, 358 N.E.2d 565 (1976). ODH/VS has not quantified the effort needed to provide the requested dataset, but nothing in the record suggests it is more than a brief administrative task. Nor may an office withhold public records because it disagrees with the legislative policy making them public. *State ex rel. WBNS TV, Inc. v. Dues*, 101 Ohio St.3d 406, 2004-Ohio-1497, 805 N.E.2d 1116, ¶ 36-37. Miller further notes that ODH/VS did not assert that any public records exception applied to cause of death data when releasing it to Miller in years past, or when denying the April 20, 2020 request.

{¶23} However, prior willingness to disclose records does not estop a public office from later exercising available defenses, *State ex rel. Dispatch Printing Co. v. Johnson,* 106 Ohio St.3d 160, 2005-Ohio-4384, 833 N.E.2d 274, ¶ 38, and the office may defend litigation by asserting exceptions not claimed at the time of denial. R.C. 149.43(B)(3). ODH/VS is thus permitted to assert that the requested dataset of COVID-19 records can be withheld as "personal health information," R.C. 3701.17(B).[5]

**Burden of Proof in Asserting Public Records Exceptions**

{¶24} Public records exceptions are laws prohibiting or excusing disclosure of records that are otherwise public. The burden to establish a claimed exception rests on the public office. *State ex rel. Welsh-Huggins v. Jefferson Cty. Prosecutor's Office,* Slip Opinion No. 2020-Ohio-5371, ¶ 35. Exceptions to disclosure are strictly construed against the public-records custodian. *State ex rel. Rogers v. Dept. of Rehab. & Corr.*, 155 Ohio St.3d 545, 2018-Ohio-5111, 122 N.E.3d 1208, ¶ 7. A custodian does not meet this burden if it has not proven that the requested records fall squarely within the exception. *State ex ref. Cincinnati Enquirer v. Jones-Kelley,* 118 Ohio St.3d 81, 2008-

---

[5] ODH/VS also refers in passing to the Health Information Portability and Accountability Act (HIPAA) (Response at 5-6), but the confidentiality provisions of HIPAA apply only to protected health information obtained by a "covered entity," i.e., health plan, health care clearinghouse, or health care provider. 42 U.S.C. 1320d; 45 C.F.R. 160.103. ODH/VS does not cite any statute, regulation, or case law establishing ODH/VS as a "covered entity" under 45 CFR 160.103. Even were ODH/VS a "covered entity," HIPAA does not supersede the Ohio Public Records Act. *State ex rel. Cincinnati Enquirer v. Daniels*, 108 Ohio St.3d 518, 2006-Ohio-1215, 844 N.E.2d 1181, ¶ 19-28, 34.

Ohio-1770, 886 N.E.2d 206, paragraph two of the syllabus. Any doubt should be resolved in favor of disclosure of public records. *State ex rel. James v. Ohio State Univ.*, 70 Ohio St.3d 168, 169, 637 N.E.2d 911 (1994).

**The Requested Death Certificate Data is Expressly Public**

{¶25} Specific ODH/VS public records exceptions regarding death certificate content, R.C. 3705.23(A)(1) and (5) (certain information relating to juveniles and SSNs), are not implicated by Miller's request. R.C. Chapter 3705 contains no other exceptions naming "cause of death" data, either in the abstract or in relation to an individual decedent. R.C. 3705.29 and R.C. 3705.99 establish other prohibited activities and penalties regarding vital records, but do not prohibit disclosure of any part of a death certificate beyond the terms contained in R.C. 3705.23.

{¶26} The General Assembly has preempted application of any other exception that might apply, by mandating the public disclosure of death certificates. R.C. 3705.23. Death certificates are prepared on a prescribed form, R.C. 3705.16(C), O.A.C. 3701-5-02(A)(2) *Certificate of death* (Appendix B) and must contain all items of information requested thereon. O.A.C. 3701-5-02(B)(1) to (3). One of the items is "28. Part I. Enter the disease, injuries, or complications that caused the death." Copies of death certificates can be obtained from both ODH/VS and local registrars, and are utilized by probate courts,[6] cemeteries,[7] funeral directors, and commercial lenders,[8] in addition to their unconditional release to any person who requests a certified copy. Every decedent's cause of death is a personally identified causal relationship in a document that is statutorily required to be disclosed to the public, and thus expressly public.

{¶27} The statute mandating release of death certificates places no restriction on further dissemination of their contents. R.C. 3705.23(A)(1). Indeed, the General Assembly anticipates dissemination and use of vital record contents by accrediting a

---

[6] *See* R.C. 2105.35.
[7] *See* R.C. 3705.17.
[8] *See* R.C. 1321.66.

certified copy as "prima facie evidence of the facts stated in it in all courts and places." R.C. 3705.23(A)(3). *See Perez v. Cleveland*, 66 Ohio St.3d 397, 399, 613 N.E.2d 199 (1993) (referencing a cause of death "as declared in the death certificate, which is indisputably a public record").

{¶28} Generally, once a public record horse is out of the barn there is no point in or requirement to lock the barn door. "Once clothed with the public records cloak, the records cannot be defrocked of their status." *State ex rel. Cincinnati Enquirer v. Hamilton Cty.*, 75 Ohio St.3d 374, 378, 662 N.E.2d 334 (1996). Records established as public records cannot be made confidential merely by placing them in a different location. *Id.* (9-1-1 call recordings are public when made and are not susceptible to general exceptions when later aggregated by law enforcement investigators, prosecutors, or grand juries.) *Accord State ex rel. Dispatch Printing Co. v. Morrow Cty. Prosecutor's Office*, 105 Ohio St.3d 172, 2005-Ohio-685, 824 N.E.2d 64, ¶ 9-14; *State ex rel. Dillery v. Icsman*, 92 Ohio St.3d 312, 316, 750 N.E.2d 156 (2001). *See also* 1996 Ohio Op. Atty. Gen. No. 034 (where county recorder receives and publicly records instruments in accordance with statutory directives, social security numbers included in the records are not subject to the general exemption that would otherwise apply). Here, the requirement that death certificates be reported, recorded, provided upon demand, and serve as evidence of their contents "in all courts and places" establishes an expectation that the cause of death associated with every decedent "will be recorded and disclosed to the public." *See Cincinnati Enquirer v. Hamilton Cty.* at 378. The requested death data is expressly and indisputably "public."

{¶29} In R.C. Chapter 3701, applicable to the Department of Health generally, R.C. 3701.17 provides, in pertinent part:

(A) As used in this section:

* * *

> (2) "Protected health information" means information, in any form, including oral, written, electronic, visual, pictorial, or physical that describes an individual's past, present, or future physical or mental health status or condition, receipt of treatment or care, or purchase of health products, if either of the following applies:
>
>> (a) The information reveals the identity of the individual who is the subject of the information.
>>
>> (b) The information could be used to reveal the identity of the individual who is the subject of the information, either by using the information alone or with other information that is available to predictable recipients of the information.
>
> (B) Protected health information reported to or obtained by the director of health, the department of health, or a board of health of a city or general health district is confidential and shall not be released without the written consent of the individual who is the subject of the information * * *

Even assuming, *arguendo*, that the cause of death reported on a death certificate is information describing an identified individual's past physical status or condition, ODH/VS cites no case law where R.C. 3701.17 has been applied to death certificates or their contents. What little case law exists for R.C. 3701.17 involves its application to records of living individuals, e.g., *Bd. of Health v. Lipson O'Shea Legal Group*, 2013-Ohio-5736, 6 N.E.3d 631 (8th Dist.),[9] affirmed by *Cuyahoga Cty. Bd. of Health v. Lipson O'Shea Legal Group*, 145 Ohio St.3d 446, 2016-Ohio-556, 50 N.E.3d 499. If R.C. 3701.17 did apply to death certificate contents, then ODH/VS and local registrars would have been violating the statute each time they released a certified death certificate pursuant to R.C. 3705.23. Yet there is no evidence that ODH/VS or local registrars redact cause of death from certified death certificates, or that they have been sued for failure to do so.[10] ODH/VS' claim that the content of statutorily public death certificates

---

[9] Contrary to ODH/VS' assertion (Response at 4-5), ¶ 30 of this case does not expressly hold that any death certificate information is exempt pursuant to R.C. 3701.17.

[10] ODH/VS cites *Biddle v. Warren Gen. Hosp.*, 86 Ohio St.3d 395, 715 N.E.2d 518 (1999) for the proposition that such a suit could lie for disclosure of the requested information. (Response at 5, fn. 1.)

is subject to a general ODH personal health information statute is barred by the "well-settled principle of statutory construction that 'when two statutes, one general and the other special, cover the same subject matter, the special provision is to be construed as an exception to the general statute which might otherwise apply.'" *State ex rel. Slagle v. Rogers*, 103 Ohio St.3d 89, 2004-Ohio-4354, 814 N.E.2d 55, ¶ 14, quoting *State ex rel. Dublin Securities, Inc. v. Ohio Div. of Securities*, 68 Ohio St.3d 426, 429, 627 N.E.2d 993. *See also* R.C. 1.51.

{¶30} The General Assembly knows how to specify exceptions from the Public Records Act, and plainly chose not to make decedents' causes of death an exception from the disclosure of death certificate data kept by ODH/VS. Note that despite the public nature of certified printed death certificates, the General Assembly could have enacted an exemption shielding the electronic death data compilations from the public. For example, records of criminal arrests and convictions are statutorily public in the hands of law enforcement agencies and courts, but are subject to an exception from public records disclosure where gathered and maintained in the Ohio Bureau of Criminal Identification and Investigation database. R.C. 109.57(D)(1)(a). The General Assembly crafted a similar exception for "medical records, law enforcement investigative records, coroner investigative records, laboratory reports, and other records concerning a decedent" aggregated by ODH in the Violent Death Reporting System, even though some of these could be public at their source. However, there is no special exception treating electronically compiled death certificate data differently from the same data in publicly available printed death certificates.

{¶31} Considering the facts and circumstances of this case, the special master concludes that ODH/VS has not demonstrated the clear and convincing proof necessary

---

However, *Biddle* concerned the physician-patient privilege, not claimed here by ODH/VS and not shown to be implicated in post-mortem death certificate notifications.

to apply R.C. 3701.17 as an exception to public release of the requested records. *See State ex rel. Summers v. Fox*, Slip Opinion No. 2020-Ohio-5585, ¶ 33.

**Conclusion**

{¶32} The evidence before the court demonstrates that respondent keeps multiple databases containing the records responsive to the request and that respondent can produce the requested data output using existing software. Respondent has not shown that the records, compiled from death certificates required to be disclosed in their entirety to any person, become exempt from release as personal health information when aggregated in its databases.

{¶33} Accordingly, the special master recommends the court order respondent to provide requester with the requested records. It is further recommended the court order that requester is entitled to recover from respondent the amount of the filing fee of twenty-five dollars and any other costs associated with the action that she has incurred. It is recommended costs be assessed to respondent.

{¶34} *Pursuant to R.C. 2743.75(F)(2), either party may file a written objection with the clerk of the Court of Claims of Ohio within seven (7) business days after receiving this report and recommendation. Any objection shall be specific and state with particularity all grounds for the objection. A party shall not assign as error on appeal the court's adoption of any factual findings or legal conclusions in this report and recommendation unless a timely objection was filed thereto. R.C. 2743.75(G)(1).*

JEFF CLARK
Special Master

**Filed March 23, 2021**
**Sent to S.C. Reporter 4/1/21**